**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AMERICAN RECOVERY CORPORATION,
Plaintiff-Appellee,

v.

COMPUTERIZED THERMAL IMAGING,
INCORPORATED; DAVID B. JOHNSTON,
Defendants-Appellants,

No. 96-1207

and

RICHARD V. SECORD; LOOPER, REED,
MARK, AND MCGRAW, INCORPORATED;
DONALD R. LOOPER; FLUOR-DANIEL,
INCORPORATED,
Defendants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-95-1323-A)

Argued: May 6, 1996

Decided: September 3, 1996

Before MURNAGHAN, WILLIAMS, and MOTZ, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Williams wrote
the opinion, in which Judge Murnaghan and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Wayne Lee Emery, Warsaw, Virginia, for Appellants.
Lovida Hardin Coleman, Jr., SUTHERLAND, ASBILL & BREN-

NAN, Washington, D.C., for Appellee. **ON BRIEF:** Jay Y. Mandel, SUTHERLAND, ASBILL & BRENNAN, Washington, D.C., for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Computerized Thermal Imaging, Incorporated, and David B. Johnston (collectively, CTI) appeal from the district court's denial of their motion for a stay pending arbitration. Relying on Mediterranean Enterprises v. Ssangyong, 708 F.2d 1458 (9th Cir. 1983), the district court held that American Recovery Corporation's (ARC) claims against CTI neither arose out of nor related to the consulting agreement that contained the arbitration clause upon which CTI based its motion. Concluding that the district court used the improper legal standard for determining whether ARC's claims were arbitrable, we hold that ARC's claims against CTI relate to the consulting agreement. Accordingly, we vacate the district court's order denying CTI's motion for a stay pending arbitration and remand the case to the district court for further proceedings.

I.

CTI was a member of a consortium of business firms that formed a joint venture for the purpose of installing thermal imaging, hospital services, and related medical technology in a network among the hospitals and medical centers in the Peoples Republic of China. CTI retained ARC, a corporation that specializes in facilitating national and international transactions and joint ventures, to provide assistance in seeking the services of a professional communications engineering firm for the project.

ARC and CTI memorialized their compact in a consulting agreement. The agreement provided that ARC would introduce representatives of a professional communications engineering firm to CTI or another member of the consortium with the ultimate goal of persuading the engineering firm to provide its services to the consortium in

2

conjunction with the China venture. In addition to the consulting agreement with CTI, ARC entered into noncircumvention agreements with two engineering firms, Fluor-Daniel and Parsons Engineering, which prevented those engineering firms from negotiating with the consortium except through ARC. In the consulting agreement, CTI acknowledged the existence of the noncircumvention agreements and agreed not to enter into any agreements with engineering firms except in compliance with the consulting agreement and the noncircumvention agreements. Additionally, the consulting agreement contained an arbitration clause that provided that "[a]ny dispute, controversy, or claim arising out of or related to this Consulting Agreement shall be resolved by binding arbitration." (J.A. at 132.)

The consulting agreement was later amended to provide incentives to ARC to secure funding for the China project through the sale of medical identification cards. Finding itself in need of additional financing, CTI requested that ARC enter negotiations with Electronic Data Systems (EDS) to contribute capital in addition to systems management and systems integration services for the China project. Through the efforts of ARC, CTI obtained the capital it sought from EDS. Although Richard V. Secord, director, president, and one-third shareholder of ARC, informed ARC that he was negotiating with CTI for an amendment to the consulting agreement to compensate ARC for these efforts, ARC alleges that it never received compensation from CTI.

Shortly after the negotiation with EDS, Secord resigned as a director and officer of ARC and entered into a personal services agreement with CTI. Pursuant to that agreement, Secord assisted CTI in obtaining a letter of intent from Fluor-Daniel to assist in the China project, which ARC alleges is in violation of the noncircumvention and consulting agreements.

In July 1995, CTI filed a declaratory judgment action in the United States District Court for the Southern District of Texas seeking to have the court declare that Secord's personal services agreement with CTI did not violate the terms of his stockholder's agreement with ARC and that CTI owed no compensation to ARC under the consulting agreement. On CTI's motion, that lawsuit was dismissed for lack of jurisdiction before responsive pleadings were due from ARC. In

3

September 1995, CTI refiled an identical lawsuit in the same district; ARC successfully moved the district court to dismiss this suit, again on jurisdictional grounds, before any discovery had taken place.

Later that month, ARC filed a ten-count complaint in the United States District Court for the Eastern District of Virginia against CTI, Secord, a law firm that formerly represented ARC (Looper, Reed, Mark, and McGraw), and Donald R. Looper, the lawyer who negotiated Secord's personal services agreement with CTI. On November 1, CTI filed a notice of arbitration pursuant to the arbitration clause of the consulting agreement for the three claims [1] ARC asserted against it: (1) that CTI induced Secord's breach of his fiduciary duty to ARC; (2) that CTI induced Fluor-Daniel's breach of the noncircumvention agreement; and (3) under a theory of quantum meruit, that CTI owed ARC compensation for securing financing from EDS for the China venture. Also on November 1, CTI filed a motion to dismiss ARC's Virginia complaint for lack of personal jurisdiction and improper venue. The district court later denied this motion.

After receiving notice of the arbitration filing on November 10, ARC informed CTI and the arbitrators of its intent not to participate in the arbitration proceedings and, on November 22, filed its first discovery requests in the Virginia action. On December 6, CTI answered ARC's complaint, raising arbitration as an affirmative defense, and filed a motion pursuant to the Federal Arbitration Act to stay proceedings pending arbitration, see 9 U.S.C.A.§ 3 (West 1970) (providing for a stay of proceedings in the district court upon any issue which is referable to arbitration under a written arbitration agreement). After the district court denied the motion to stay, reasoning that ARC's claims were not within the scope of the arbitration clause, CTI timely filed this appeal, see 9 U.S.C.A. § 16(a)(1)(A) (West Supp. 1996) ("An appeal may be taken from an order refusing a stay of any action under section 3 of this title . . . .").

Before us, CTI raises three issues: (1) whether the district court erred in denying CTI's motion to stay proceedings pending arbitra-

_____

[1] The parties to the lawsuit do not dispute that the other seven claims, lodged by ARC against Secord, Looper, and the law firm, do not fall within the scope of the arbitration clause and are thus not arbitrable.

4

tion; (2) if we determine that the district court erred in denying the stay, whether CTI waived its right to the stay pending arbitration; and (3) if we determine that the district court erred in denying the stay and that CTI did not waive its right to that stay, whether we should remand this case to the district court with the direction to stay the non-arbitrable claims pending the resolution of the arbitration proceedings. We address each of CTI's contentions in turn.

II.

CTI contends that the district court erred in denying its motion to stay proceedings pending arbitration. In contesting the ruling of the district court, CTI argues that the district court incorrectly concluded that the claims ARC asserts did not fall within the scope of the arbitration clause of the consulting agreement. We review de novo the district court's conclusions regarding the arbitrability of the disputes between ARC and CTI. See Kansas Gas & Elec. Co. v. Westinghouse Elec. Corp., 861 F.2d 420, 422 (4th Cir. 1988). After briefly reviewing the governing principles that guide a court in determining whether a dispute is arbitrable, we find that the district court applied the incorrect legal standard in reaching its decision and conclude that each of ARC's claims falls within the scope of the arbitration clause of the consulting agreement.

A.

Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). Nevertheless, the Supreme Court has announced its "healthy regard for the federal policy favoring arbitration" and has explained that the Federal Arbitration Act, 9 U.S.C.A. §§ 1-16 (West 1970 & Supp. 1996), "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hosp. v. Mercury Constr. Co., 460 U.S. 1, 24-25 (1983). To that end, "the heavy presumption of arbitrability requires that when the scope of the arbi-

5

tration clause is open to question, a court must decide the question in favor of arbitration." <u>Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.</u>, 867 F.2d 809, 812 (4th Cir. 1989). Thus, we may not deny a party's request to arbitrate an issue "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." <u>Warrior & Gulf Navigation Co.</u>, 363 U.S. at 582-83. Having established our principles for review, we turn to CTI's arguments.

B.

As an initial matter, CTI contends that the district court applied an improper legal standard in concluding that ARC's three claims against CTI did not fall within the scope of the arbitration clause in the consulting agreement. Relying on the Ninth Circuit's decision in <u>Mediterranean Enterprises</u>, the district court reasoned that the tortious-interference-with-contract claim and the inducement-of-breach-of-fiduciary-duty claim did not arise out of or relate to the consulting agreement because the claims sounded in tort rather than contract and because the resolution of the claims in no way turned upon the interpretation of the terms of the consulting agreement. <u>See Mediterranean Enters.</u>, 708 F.2d at 1464 (holding that a tortious interference claim did not fall within the scope of an arbitration clause because the claim "allege[d] activity and raise[d] issues which [were] predominantly unrelated to the central conflict over the interpretation and performance of the Agreement" containing the arbitration clause). Regarding the quantum meruit claim, the district court again relied on <u>Mediterranean Enterprises</u> in finding that ARC's claim did not fall within the scope of the arbitration clause. The district court held that ARC's quantum meruit claim by its very definition arose outside the scope of the consulting agreement. <u>See id.</u> at 1464-65 (holding that a quantum meruit claim could not arise out of a contract containing an arbitration clause because "[a]n action does not lie on an implied contract where there exists between the parties a valid express contract which covers the identical subject matter").

We agree with CTI that the standard in <u>Mediterranean Enterprises</u> was an improper foundation for the district court's decision. In <u>Mediterranean Enterprises</u>, the Ninth Circuit construed the scope of a clause in a joint venture agreement that provided:"`Any disputes

6

arising hereunder or following the formation of joint venture shall be settled through binding arbitration.'" Id. at 1461 (emphasis added) (quoting the arbitration clause in part). The court found that the phrase "arising hereunder" was synonymous with"arising under the Agreement[,]" a phrase that had previously been construed to be "`relatively narrow as arbitration clauses go.'" Id. at 1464 (quoting Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc. , 253 F. Supp. 359, 364 (S.D.N.Y. 1966)). The court then concluded that the clause limited the arbitration of disputes to those that"relat[ed] to the interpretation and performance of the contract itself[,]" noting that this formulation was much narrower than "the arising out of or relating to" standard recommended by the American Arbitration Association. Id. Thus, the Ninth Circuit explicitly held that the tortious interference and quantum meruit claims were not arbitrable in the presence of a narrow arbitration clause, the scope of which was limited to disputes relating to the interpretation and performance of the contract containing the arbitration clause itself.

In contrast, ARC and CTI agreed through the arbitration clause in the consulting agreement to arbitrate any dispute that "ar[ose] out of or related to" the consulting agreement. (J.A. at 132.) Both the Supreme Court and this court have characterized similar formulations to be broad arbitration clauses capable of an expansive reach. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967) (labelling as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"); J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 321 (4th Cir. 1988) (after declaring that the scope of a clause providing for the arbitration of "[a]ll disputes arising in connection with" a contract was identical to that of a clause providing for the arbitrability of disputes that "may arise out of or in relation to" an agreement, construing the arbitration clause "to encompass a broad scope of arbitrable issues" (alteration in original)). In J.J. Ryan & Sons, we distinguished narrow arbitration clauses that required only the arbitration of claims arising under the contract and we explained that the sweeping language of a similarly broad arbitration clause "d[id] not limit arbitration to the literal interpretation or performance of the contract[, but] embrace[d] every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." Id. (emphasis added).

7

Because the broad arbitration clause negotiated by ARC and CTI rendered arbitrable all disputes having a significant relationship to the consulting agreement regardless of whether those claims implicated the terms of the consulting agreement, the district court erred in concluding that ARC's claims did not fall within the scope of the arbitration agreement because they did not turn upon the interpretation of the terms of the consulting agreement. Thus, the district court employed an improper legal standard in determining whether ARC's claims against CTI were arbitrable.

Consequently, we must now determine whether the arbitration clause in the consulting agreement encompasses the disputes between ARC and CTI, applying the proper legal standard by examining the significance of the relationship between each of ARC's claims and the consulting agreement. See id. In applying this standard, we "must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim." Id. at 319. Bearing in mind the strong federal policy in favor of arbitration and the broad nature of this arbitration clause, we examine each of ARC's claims seriatim.

1.

In its first claim against CTI, ARC contends that CTI tortiously induced Secord's breach of fiduciary duty by secretly negotiating the personal services agreement with Secord. In its complaint, ARC asserts that Secord's personal services agreement with CTI "was a continuation of the services ARC was already providing to CTI under the CTI Consulting Agreement[ because b]oth the CTI Consulting Agreement and the Personal Services Agreement . . . essentially require the services of a `liaison' between CTI and other participants in the China Project, including the engineers." (J.A. at 24-25.) In effect, ARC contends that CTI, through the personal services agreement, induced Secord to misappropriate a corporate opportunity that rightly belonged to ARC.

We agree with CTI that ARC's claim significantly relates to the consulting agreement and is thus arbitrable. To prove that the benefits accruing to Secord under the personal services agreement were a corporate opportunity, ARC must prove that it had "a legitimate interest

8

or expectancy in . . . a particular business opportunity." See, e.g., Alexander v. Sturkie, 909 S.W.2d 166, 169 (Tx. Ct. App. 1995); 3 Beth A. Buday & Gail A. O'Gradney, Fletcher Cyclopedia of the Law of Private Corporations § 861.10 (perm. ed. rev. vol. 1994) ("[T]he doctrine of corporate opportunity . . . prohibits one who occupies a fiduciary relationship to a corporation from acquiring, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy . . . ."). To establish that it had a legitimate interest, ARC posits in its complaint that the personal services agreement encompasses its obligations under the consulting agreement in addition to other duties that are a logical extension of the services provided by ARC under the consulting agreement. To strengthen its claim, ARC asserts that "[t]he compensation under the Personal Services Agreement is compensation for work ARC was already performing under the CTI Consulting Agreement." (J.A. at 28.) Therefore, the proof of ARC's claim that CTI induced Secord to breach his fiduciary duty is rooted in the existence and terms of the consulting agreement.

ARC argues that its claim regarding CTI's inducement of Secord's breach of fiduciary duty is not related to the consulting agreement because the personal services agreement would have breached Secord's duty of loyalty even without the existence of the consulting agreement. This contention, although arguably plausible given the appropriate factual circumstances, is belied by ARC's clear reliance on the consulting agreement to establish its claim in the complaint; thus, we reject it. ARC further argues that we should not find the claim to be arbitrable because the parties did not intend for the arbitration clause to be this broad. Although ARC is correct in noting that the intention of the parties is relevant, the intentions of parties to an arbitration agreement are generously construed in favor of arbitrability, see Peoples Sec. Life Ins. Co., 867 F.2d at 813, and here, ARC and CTI explicitly agreed on an arbitration clause that by its plain language has a broad scope. Because the factual allegations underlying ARC's claim fall within the scope of the consulting agreement's arbitration clause, we hold that the district court erred in finding this claim not to be arbitrable.

2.

In its second claim against CTI, ARC contends that CTI tortiously interfered with its contractual relationship with Fluor-Daniel by

9

inducing Fluor-Daniel to breach its noncircumvention agreement with ARC. ARC alleges that Fluor-Daniel breached the noncircumvention agreement by agreeing to provide project management services and a financing commitment to CTI for the China project without compensating ARC for its release from the noncircumvention agreement as agreed. In the consulting agreement, CTI had expressly promised "not [to] enter any agreements with [Fluor-Daniel] except in compliance with [the] Noncircumvention Agreement[ ] and this Consulting Agreement." (J.A. at 21 (second alteration in original).)

ARC's claim of tortious interference with contractual relations clearly relates to the consulting agreement: An express term of the consulting agreement mandates that CTI will not enter into any agreement with Fluor-Daniel in violation of the noncircumvention agreement. Thus, the conduct of which ARC complains explicitly contravenes a term of the consulting agreement.

ARC attempts to minimize this relationship by pointing out that its claim arises under the noncircumvention agreement, not the consulting agreement. We find this argument unpersuasive: As explained above, the test for an arbitration clause of this breadth is not whether a claim arose under one agreement or another, but whether a significant relationship exists between the claim and the agreement containing the arbitration clause. See J.J. Ryan & Sons , 863 F.2d at 321. Because we find such a relationship clearly exists here, we hold that ARC's tortious interference claim is properly referable to arbitration.

3.

In its third claim against CTI, ARC contends that it is entitled to compensation from CTI for securing a financing commitment from EDS for the China project. ARC alleges a prior pattern of compensation in which CTI requested that ARC find additional funding for the China project, ARC secured that funding, and then CTI compensated ARC for its efforts through an amendment to the consulting agreement. Furthermore, ARC alleges in its complaint that "Secord told ARC that he . . . w[as] negotiating another amendment to the CTI Consulting Agreement which would provide compensation to ARC for its efforts to secure funding for the China Project from EDS." (J.A. at 23.)

10

As with ARC's first and second claims, we likewise find that ARC's quantum meruit claim relates to the consulting agreement: ARC again clearly relies on the terms of the consulting agreement to prove its claim. To establish its entitlement to compensation, ARC relies on a prior amendment to the consulting agreement as well as its allegation that Secord informed ARC that its efforts in securing the EDS funding would be compensated through the vehicle of an amendment to the consulting agreement, as had been done before.

In urging us to find that the quantum meruit claim does not relate to the consulting agreement, ARC argues, as the district court held, that a quantum meruit claim by its definition arises outside of the consulting agreement. As we have explained, however, a claim may arise outside of an agreement and yet still be related to that agreement; we must analyze the relationship between the claim and the agreement without regard to "the legal label assigned to the claim." See J.J. Ryan & Sons, 863 F.2d at 319. Because we find that ARC's quantum meruit claim is sufficiently related to the consulting agreement as to fall within the scope of the arbitration clause, we hold that the district court erred in not referring it to arbitration. Having concluded that ARC's claims against CTI fell within the scope of the arbitration clause in the consulting agreement, we must next consider whether CTI has waived its right to a stay pending arbitration.

III.

ARC contends that even if its claims against CTI were arbitrable under the consulting agreement, CTI waived its right to invoke the Federal Arbitration Act by filing the two Texas declaratory judgment actions and by failing in the Virginia action to raise arbitration as an affirmative defense in a timely manner.**2** See 9 U.S.C.A. § 3 (provid-

_____

**2** Because the district court concluded that ARC's claims against CTI were not arbitrable, it did not rule on whether CTI had waived its right to arbitration. In any event, because a district court's ruling on waiver under the Federal Arbitration Act is subject to de novo review, Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc., 817 F.2d 250, 252 (4th Cir. 1987), we may reach this issue, see Maxum Foundations, Inc. v. Salus Corp., 779 F.2d 974, 981-83 (4th Cir. 1985) (reaching waiver issue not ruled on by the district court after concluding that the district court erred in holding that the plaintiff's claims were not arbitrable).

11

ing that a party with an arbitrable claim may apply for a stay of the trial of that action if "the applicant for the stay is not in default in proceeding with such arbitration"). Because we find that CTI has not so substantially utilized the litigation machinery as to prejudice ARC, we decline to hold that CTI waived its right to arbitration.

Under the Federal Arbitration Act, "[a] litigant may waive its right to [arbitration] by so substantially utilizing the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay." Maxum Foundations, Inc. v. Salus Corp., 779 F.2d 974, 981 (4th Cir. 1985). Because of the strong federal policy favoring arbitration, however, we will not lightly infer the circumstances constituting waiver. Id. Our key inquiry is whether the party opposing the stay has suffered any actual prejudice. Id. at 982. Although "mere delay, without more, will not suffice to constitute waiver," id., "delay and the extent of the moving party's trial-oriented activity are material factors in assessing a plea of prejudice," Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc., 817 F.2d 250, 252 (4th Cir. 1987). The party opposing the stay bears the heavy burden of proving waiver. Britton v. Co-op Banking Group , 916 F.2d 1405, 1412 (9th Cir. 1990).

ARC first contends that CTI waived its right to arbitration by filing the consecutive, identical declaratory judgment actions in the United States District Court for the Southern District of Texas. We disagree. ARC is unable to state how it was prejudiced by CTI's filing of the declaratory judgment actions. Neither ARC nor CTI ever initiated discovery in either action, and we cannot consider CTI's defense to ARC's motion to dismiss in the second action to be a"`substantial[ ] invok[ation] [of] the litigation machinery,' which would support a finding of waiver." See Marlin Oil Corp. v. Colorado Interstate Gas Co., 700 F. Supp. 1076, 1081 (W.D. Okla. 1988) (holding that defense to motion to dismiss declaratory judgment action insufficient to waive right to arbitration) (alterations in original) (quoting E.C. Ernst, Inc. v. Manhattan Constr. Co., 559 F.2d 268, 269 (5th Cir. 1977), cert. denied, 434 U.S. 1067 (1978)). Without more, CTI's mere filing of the declaratory judgment actions in the Southern District of Texas does not constitute legally sufficient prejudice for CTI to have waived its rights to arbitration. See Carolina Throwing Co. v. S & E Novelty Corp., 442 F.2d 329, 330-31 (4th Cir. 1971) (per

12

curiam) (holding that filing of a counterclaim alone is insufficient to waive right to arbitration; prejudice must be proven); Marlin Oil Corp., 700 F. Supp. at 1081.

Next, ARC argues that by failing to raise arbitration as an affirmative defense in the Eastern District of Virginia until December 6, 1995, ARC experienced sufficient prejudice that CTI should be held to have waived its right to arbitration. ARC contends that by the time CTI raised arbitration as a defense, ARC had already expended considerable efforts in serving discovery requests on all parties. ARC asserts that it was further prejudiced after CTI raised arbitration as an affirmative defense because CTI "vigorously pursued full discovery from ARC" after its motion to stay was denied. Appellee's Brief at 15.

We cannot accept ARC's arguments: CTI's conduct in the Eastern District of Virginia is not legally sufficient to constitute a default of its arbitration rights under the Federal Arbitration Act. Although CTI did not raise arbitration as an affirmative defense until after ARC had served discovery requests, ARC received notice that CTI intended to pursue arbitration when ARC received a notice on November 10 from the arbitration authority. By the time it propounded its first discovery requests on November 22, ARC had known for nearly two weeks that CTI planned to pursue arbitration of the claims and also that ARC had not yet filed its answer, the pleading where the affirmative defense of arbitration must be raised, see Fed. R. Civ. P. 8(c) (providing that arbitration is required to be raised as an affirmative defense in the answer). Under these circumstances, we cannot find that CTI waived its right to arbitration. See Maxum Foundations, Inc., 779 F.2d at 982-83 (holding that defendant had not waived its right to arbitrate when it did not raise arbitration as an affirmative defense in its answer, it delayed three months after the complaint to file a motion to dismiss because of arbitrability, and it filed the motion to dismiss after discovery had been initiated in the action). Regarding the alleged prejudice suffered by ARC because of CTI's pursuit of discovery after the district court denied its motion to stay pending arbitration, we observe that a "party seeking arbitration does not lose its contractual right by prudently pursuing discovery in the face of a court-ordered deadline." Id. at 982 ("declin[ing] to create a rule that would require a party seeking arbitration to avoid a finding of default by ignoring court-

13

ordered discovery deadlines and assuming the risk that its motion under the Federal Arbitration Act will be unsuccessful"). Thus, we hold that ARC has failed to carry its burden of proving that CTI's actions constituted a default of its right to arbitrate under the Federal Arbitration Act. ARC's claims against CTI therefore are subject to arbitration.

IV.

Finally, ARC and CTI disagree on whether the non-arbitrable claims remaining before the district court should be stayed pending the resolution of the arbitration proceedings. CTI contends that we should stay the entire action before the district court because many of the issues underlying the arbitrable claims are the same as those underpinning the non-arbitrable claims, and allowing arbitration to proceed and staying the district court action would preserve judicial resources by narrowing the issues eventually set for trial. ARC responds with the opposite contention: Because a trial would con-clude before the completion of the arbitration proceedings, the trial should continue. A trial would narrow the issues and potentially obvi-ate the need for arbitration, ARC argues.

We believe that the answer to this question lies within the sound discretion of the district court. Enforcement of agreements to arbitrate under the Federal Arbitration Act may require piecemeal litigation, see Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985), and the decision to stay the litigation of non-arbitrable claims or issues is a matter largely within the district court's discretion to control its docket, Moses H. Cone Mem. Hosp., 460 U.S. at 20 n.23; Summer Rain v. Donning Co./Publishers, Inc., 964 F.2d 1455, 1461 (4th Cir. 1992). Therefore, we leave this issue for the district court to resolve on remand.

V.

In summary, we hold that the district court erred in denying CTI's motion for a stay pending arbitration because ARC's claims fall within the scope of the consulting agreement's arbitration clause and CTI has not waived its rights to arbitration through its utilization of the litigation machinery. We remand for further proceedings not

14

inconsistent with this opinion and for a determination by the district court of whether to stay the non-arbitrable claims pending resolution of the arbitration proceedings.

<u>VACATED AND REMANDED</u>

15